Davis et al., Appellants, v. Halter et al., Appellees.

(No. 2141—Decided May 16, 1944.)

*Messrs. Amerman, Mills, Mills, Jones & Mansfield* and *Mr. Earl D. Bair,* for appellants.

*Messrs. Hart & McHenry,* for appellee A. F. Deible.

Putnam, J. The appeal to this court is on questions of law from the action of the court below in directing a verdict for the defendant Deible, an appellee herein, at the close of the plaintiffs' case. The appeal as to defendant Halter, an appellee herein, has heretofore been disposed of.

This is an action for wrongful death brought by Clarence Davis and others against John Halter and A. F. Deible. Plaintiffs, appellants herein, are the father,

mother, brothers and sisters of Paul Davis, deceased, who was 14 years old at the time of his death.

The defendant Deible was the lessee of certain lands, owned by Louisa Halter, for the purpose of mining coal. He had been the operator of a mine on such lands prior to its abandonment some months before Paul Davis was killed by falling from a ladder in a ventilating shaft which he had entered in search of water.

The action was predicated on Section 898-108, General Code, which provides in part as follows:

"The owner, lessee, or agent shall effectively close or fence all openings to mines abandoned subsequently to the passage of this act so that persons or animals cannot inadvertently enter therein."

The remainder of the section provides for a penalty for violation.

The record shows the following facts:

The Halter farm, except 10 acres around the buildings, was leased to Deible in 1933 for the purpose of mining coal thereon and he operated a mine on the farm until April 1942 when the mine was abandoned. At that time there was a vertical, circular, fresh-air shaft, 68 feet deep and about five feet in diameter, lined with tile which protruded above the ground two feet on one side and 10 inches on the other, such shaft being constructed on a sloping surface. Inside the shaft was a ladder to the bottom, which was constructed by placing iron rungs in the tile. There seems to have been landings every 10 or 15 feet down. When the mine was abandoned, the opening of the shaft was closed by covering the top with corrugated iron roofing and laying planks across the roofing to hold it down, but neither were fastened either to the tile or to each other. In addition a fence was constructed around the opening by placing posts or two-by-fours in the ground and

stringing and fastening three strands of barb wire around the same. On June 7, 1942, the date of the accident, the covering was not on the shaft. The fence and wire were in place, but the wire was sagging so that one could climb or step over it.

The Davis family had been living for four years in a tenant house on the Halter farm, about 500 feet away and across the road. The decedent, and in fact all of the Davis family, was perfectly familar with the location of the shaft which could be plainly seen from the Davis house. In fact the family was living there when the shaft was constructed, and the decedent and his brother had previously been in the shaft and climbed part way down on the ladder. On the day of the accident, a bright Sunday afternoon, the father, Paul, the decedent, and a younger brother, Richard, were sitting on the fence gate when the father told the two boys that they would explore the shaft for water. It seems the supply at the house was not suitable. They all started for the shaft, the boys running ahead. Paul got there first, climbed over the fence and started to climb down the ladder in the shaft. By the time Richard got to the shaft he heard Paul cry out, "Let's get out of here," or words to that effect. Richard then heard him fall. The father arrived in a few seconds, but the boy had already fallen and was at the bottom of the shaft from whence his body was recovered some 12 hours later.

There can be no question that all three were perfectly familar with this shaft; that they all intended to enter it and were trespassers; and that Paul actually did purposely and intentionally enter the shaft, fell and was killed after presumably being overcome with "black damp" while part way down on the ladder.

In the face of these facts and the statute, quoted *supra,* was there a jury question involved? We hold

that there was not, and that the trial court committed no error in directing a verdict. This conclusion is based upon the following considerations.

The pertinent part of the statute reads:

"* * * shall effectively close or fence all openings * * * so that persons or animals cannot inadvertently enter therein."

The contentions and argument of counsel have centered chiefly on the meaning of the word, "inadvertently," as used in the statute. The plaintiffs maintain, in effect, two propositions. First, that the words, "effectively close," or, "effectively fence," mean that the opening must be so closed or fenced that it would be impossible for persons or animals to enter therein under any circumstances. Second, that the intent of the statute is to guard against dangers inadvertently encountered in the mine once entry had been made in any manner. The difficulty with such argument is that the language employed does not convey that meaning. We must give the language used its plain meaning according to the usages of English grammar. It is to be noted that the phrase, "effectively close or fence," is modified by the phrase, "so that persons or animals cannot inadvertently enter therein." Such phrase states the purpose of the effective closing or fencing. It is to be noted further that the word, "inadvertently," modifies the verb, "enter." There is no dispute as to the definition of the word, "inadvertently." According to Webster's New International Dictionary, "inadvertence" is defined as follows: "1. The fact or action of being inadvertent; lack of heedfulness or attentiveness; inattention. 2. An effect of inattention; a result of carelessness; an oversight, mistake, or fault from negligence."

Thus we see that the effective closing or fencing is to prevent an inadvertent—heedless, unintentional,

mistaken, unforeseen—entry. If the General Assembly had intended a meaning as contended by plaintiffs, it could easily have used language to have expressed that meaning. It might have said for instance, "shall be effectively closed or fenced so that no persons or animals would be able to enter therein." Or, the General Assembly might have said, "shall be effectively closed or fenced so that no persons or animals could enter therein and thus be inadvertently injured by encountering unforeseen dangers."

However, the word, "inadvertently," is used and only to modify the verb, "enter." Consequently, it is only an "inadvertent entry" which the statute intends to guard against and not an injury in an inadvertent manner once entry had been gained in any manner. The closing or fencing must be effective for that purpose and to the extent only that it prevents an inadvertent entry.

Under this conclusion as to the meaning of the statute and under the undisputed facts of this case, which show conclusively that there was no inadvertent entry but an intentional entry by a trespasser, there can be no recovery. There was a question of law for the court and not one of fact for the jury. The judgment must be and is affirmed.

*Judgment affirmed.*

Montgomery, P. J., and Sherick, J., concur.